## Case No. 8,977.

### MAINE v. HALEY.

[2 Hask. 354.] [1]

Circuit Court, D. Maine. May. 1879.

TROVER—HOW CONVERSION PROVED — WRONGFUL POSSESSION—OWNER'S RIGHT.

To establish a conversion of chattels, there must be proof of wrongful possession, or of exclusion of the owner's right, or of unauthorized and injurious use, or of wrongful detention after demand.

Trover for the conversion of logs. Plea, not guilty. The cause was tried before the court without a jury. The only question in dispute was that of conversion.

Albert W. Paine, for plaintiff.
Bion Bradbury, for defendant.

FOX, District Judge. This is an action of trover for a parcel of pine and spruce logs, cut in 1874-75 upon township No. 8. R. 5, W. E. L. S. by C. W. Clayton, under a permit from the land agent dated November 11, 1874. This permit is in the usual form, the state thereby "reserving and retaining full and complete ownership and control of all lumber cut upon the premises, wherever and however it may be situated, until the stumpage shall be fully paid, &c." The case was transferred under the act of congress [18 Stat. 470] to this court from the supreme court for the county of Penobscot, and is submitted to the presiding justice for decision without the intervention of a jury.

It appears in evidence that supplies for logging operations for the winter 1874-75 were furnished to Clayton, by Messrs. Jew-

---

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

ett Bros., mill men at St. John, under an agreement that they were to receive the lumber from Clayton at their mills near St. John, paying therefor the fair market price.

This firm of Jewett Bros. was composed of Edward L. Jewett, N. M. Jewett and F. H. Pitcher; at the same time another firm of E. D. Jewett & Co., composed of E. D. Jewett and George K. Jewett, was carrying on business at St. John in purchasing timber lands and operating on the same, and in buying and selling logs, but not in their manufacture. These two firms were entirely independent of each other, neither having any interest in the other's business. Two of the sons of George K. Jewett were members of the firm of Jewett Bros.

Clayton's logs were marked III W III; were put into a tributary of the Aroostook and driven out of that river into the St. John. All that could be were boomed and rafted at Frederickton, but large quantities passed by the boom and were caught and rafted below by the boom company; these were mixed rafts, an account being taken of the precise quantity of each mark in the raft; those boomed at Frederickton and those rafted were sailed and rafted separately by their respective marks.

Clayton had lumbered upon the St. John waters for many years, always using this mark, which was well known by all persons upon the river as his special mark. E. D. Jewett & Co. had furnished him with supplies for some years, and had received his logs during the early part of his lumbering; but, for four or five years prior to 1874, Jewett Bros. had received from him all his timber under the same arrangement that existed in 1874–75.

The logs now in question came down the St. John river, and, in the month of October 1875, were in various places on the shores of that river near St. John and the mills of Jewett Bros., and were in the charge of James F. Ellis, as agent of Jewett Bros. E. D. Jewett & Co. had about eighteen millions of logs in the same condition, which were also under Ellis' charge. E. D. Jewett & Co., having become embarrassed, insolvency proceedings were instituted against them and a warrant of attachment to the official assignee issued against their property October 15, 1875, upon which were seized, not only the eighteen millions of logs then in the St. John river belonging to that firm, but all the other logs in the river, amounting in all to forty millions, without regard to marks and ownership, and among other logs those now in question.

All these logs were afterwards frozen up in the ice and were placed by the assignee under the charge of Joseph Horncastle and McLellan and Holly. The official assignee, Ezekiel McLeod, was afterwards chosen assignee of the creditors, and an arrangement was subsequently made between him and the defendant, John J. Haley of Boston, by which, in consideration of $100,000 paid said McLeod by said Haley, he sold to Haley all the copartnership effects and estate of E. D. Jewett & Co. in the province of Canada; and, on January 29, 1876, made and executed a deed by which he conveyed to said Haley, "all and singular, the joint estate and effects both real and personal, of every name and kind whatsoever of the said insolvents, Edward D. Jewett and George K. Jewett, being the joint estate within the dominion of Canada which came into the possession of said Ezekiel McLeod, assignee as aforesaid, subject to all subsisting liens upon any part of said estate, for stumpage, boomage, tonnage, rafting or otherwise." It is proved most conclusively that E. D. Jewett & Co. never claimed to have and never did have any right, title or interest whatever in this lot of logs, and that Haley never acquired any interest in them by the deed of the assignee of that firm. It is also established that Jewett Bros. were to become the owners of the logs under Clayton; that they were in possession of them at the time of their seizure by the process in insolvency, and that they never surrendered their possession voluntarily to any one, and resumed through their former agent their possession as soon as the assignee had sold to Haley the logs belonging to the insolvent estate, and that they never, in any way, made any transfer of their interest in these logs to Haley. It also appears that Haley never saw any of the logs, or in any way personally exercised any control or acts of ownership over them, or attempted to dispose of the same.

It is claimed, however, that by an order given by Haley on the 29th day of January and by proceedings under said order, he was guilty of a conversion of this property, and has thereby rendered himself accountable to the state for its claims for the stumpage.

This order is as follows: "St. John, N. B., January 29, 1876. Messrs. Holly & McLellan, Indian Farm, N. B. Gentlemen.—Having purchased of E. McLeod, Esq., assignee of the estate of E. D. Jewett & Co., all spruce and pine logs, timber and other lumber belonging to that estate, marked, L P C, C X C ✳, I V ✳, X F X, III W III, ✳ X, with other marks, situated at Drury Cove, Kennebecasis river, Fairy Cove, South Bay or other points in the river St. John, wherever they may be situated or found, you will please take notice, Mr. E. G. Dunn is my appointed agent in charge of this property. He will take full charge forthwith, and assume all care and risks, requiring no action whatever from any party formerly having them in charge. John M. Smart, John J. Haley."

A like order, with the omission merely of the words, "belonging to that estate," was at the same time drawn, addressed to Joseph Horncastle, and the orders were handed to these parties the same day. E. G. Dunn,

the party named as the agent of the defendant in these orders, never in any manner meddled with the property or took any charge or direction of it, and does not appear to have been informed that his name was mentioned in the instrument. These papers were drawn at the office of E. D. Jewett & Co. in St. John by a friend, who was a ready penman, and it does not distinctly appear from whom he learned the names of the various marks of logs. The principal object in giving these orders was to stop the expenses of the persons in whose possession they were, and which were somewhat burdensome, and Dunn's name was inserted, merely nominally, with no intention that he should so act in the matter.

Ellis, in fact, immediately took charge of the property, and, when the river opened, delivered to Jewett Bros., under their instructions, all of the logs in question, and the same were sold by them, or sawed at their mills, and the lumber manufactured sold by them and applied to their own benefit. The eighteen millions which formerly belonged to E. D. Jewett & Co. were sold by defendant's agents to Sutton, and the remainder of the forty millions was subsequently claimed and received by those who were entitled to it.

The logs marked III W III, having been mentioned specifically in their orders, if Dunn had acted under the orders and claimed this mark of logs and, by his interference as agent of the defendant, deprived the state of its property, it might well be that Haley would be accountable to the state for the consequences resulting from the acts of his agent; but the fact is, that Dunn never did in any respect act as agent of the defendant. He was the only person to whom Horncastle and the others named in the orders were authorized to surrender the property. Nothing was ever done under these orders directly, and, as they of themselves confer no authority upon any other party than Dunn to act in behalf of the defendant, and as Dunn never did so act, it cannot fairly be said that these orders and the action of any one under them can render the defendant accountable for converting the property.

The whole effect of these orders was to induce Horncastle and McLellan & Holly to surrender their possession, which, by directions from McLeod, February 8, 1876, they were authorized to do. These directions were as follows: "February 8, 1876. Jos. Horncastle, Esq. Dear Sir:—You will please deliver over the logs and lumber now in your possession and held by your firm, to Mr. John J. Haley, or to Messrs. E. D. Jewett & Co., for him, having sold the same to Mr. Haley. Yours. E. McLeod."

McLeod never sold or pretended to sell to Haley any other timber than that which belonged to E. D. Jewett & Co., and Dunn never made any claim to the possession of any portion of the property; but Ellis, by directions from Haley and E. D. Jewett & Co., took charge of all that he had purchased from the assignee of E. D. Jewett & Co., and nothing more; and at the same time Ellis, by directions of Jewett Bros. and as their agent, secured them possession of that portion in which they were interested. Haley in no way ever made any claim upon the logs in dispute, either personally or by any authorized agent or attorney; he received and disposed of only the logs he bought, and, having by his purchase exonerated the property of E. D. Jewett & Co. from the insolvency proceedings, the residue of the property was, without any interference by Haley, claimed, received and disposed of by the parties in whose possession it was when insolvency proceedings were instituted.

The state has lost nothing by the doings of Haley; those in whose hands the property in dispute rightfully was have again received it without burden or incumbrance; it has never for an instant been in the possession of Haley or any party acting in relation to it in his behalf, and there is nothing to establish a conversion by him of the property.

It is said that McLeod paid the boomage and expenses of towage on these logs to the Frederickton Boom Company, and that they were repaid to him by Haley; they were in fact paid by McLeod out of the $100,000 he received from Haley, and were subsequently so paid by Jewett Bros., and the court fails to find anything in this transaction which affords any support to the plaintiff's claim to hold the defendant chargeable.

What constitutes a conversion was very fully examined by Judge Shepley in Fernald v. Chase, 37 Me. 289; and it was there held that, to make a conversion, there must be proof of a wrongful possession, or of the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention of the property.

The defendant was never in possession of this property. never used it or detained it from the plaintiff or exercised any dominion over it. In all that Ellis did with these logs, he was acting as the agent and by the authority of Jewett Bros. and not as agent for Haley; and the case fails to show that the defendant did either of the acts which, according to the opinion in Fernald v. Chase, are necessary to effect a conversion.

The learned counsel for the plaintiff in his argument, as the basis of his claim, asserts that Haley took a bill of sale of this property from Mr. McLeod; but such is not the fact, as that bill of sale or deed as before recited was expressly limited to the joint property of E. D. Jewett & Co.; and the defendant thereby never acquired title to any other logs than such as formerly belonged to that firm, who never were the owners or in possession of the logs here in dispute.

The counsel also insists that these logs were taken and disposed of by Ellis as agent of E. D. Jewett & Co., and by their authority; in this assumption he is also laboring under an important error. Ellis testifies that the logs which came down the river were in his keeping as agent for Jewett Bros. before they were taken by the sheriff, and that, the next spring, he had orders from Edw. L. Jewett, one of the firm of Jewett Bros., to resume his possession and take care of this particular mark of logs as usual, and that he did so, and delivered them to Jewett Bros.' mills. Whatever Ellis did in and about this lot of logs, therefore, was done by him in his capacity of agent for Jewett Bros. and by their order and direction; and in no respect does it appear that he received any directions from E. D. Jewett & Co. as to this property, or acted in regard to it for their benefit, or for the defendant. Ellis, being the agent of E. D. Jewett & Co. who were acting for the defendant, and also agent for Jewett Bros., was acting in both capacities, taking the charge and control of the logs which belonged to his respective principals, obeying their orders and directions as to his disposal of their logs, but never receiving any instructions from the defendant or E. D. Jewett & Co., as to the logs cut by Clayton.

A large number of cases have been cited, both from the English and American reports, by the learned counsel for the plaintiff, all of which have been examined, and none of them afford any support to the claim of the plaintiff. The one most relied on is Hollins v. Fowler, L. R. 7 H. L. 757, in which it was held "that any person, who, however innocently, obtains possession of the goods of a person who has been fraudulently deprived of them, and disposes of them, whether for his own benefit or that of any other person, is guilty of a conversion;" as this defendant never had possession of these goods, and never disposed of them, the plaintiff cannot derive much advantage from this decision of the house of lords, as his case fails in two essential particulars which were there requisite to constitute a conversion.

In Polley v. Lenox Iron Works, 2 Allen, 182, one of the cases in brief of plaintiff's counsel, Judge Metcalf, on page 183, says: "Conversion, ex vi termini, imparts a wrongful act, and is the assuming upon one's self the property and right of disposing of another's goods, either by a wrongful taking of them, or by some other illegal assumption of ownership, or by illegally using or misusing them, or by wrongfully detaining them"; neither of which requirements, to effect a conversion, are shown to have been committed by the defendant.

Reference is also made to Savary v. Germania Bank [Case No. 12,387]. In that case, the defendant delivered over the plaintiff's notes to a person not entitled to them, assuming the right to deal with the notes in disregard of the plaintiff's title, and this was held to be a conversion, the court saying: "A wrongful intent is not an essential element of a conversion; it suffices that the rightful owner has been deprived of his property by some unauthorized act of another, who assumed dominion or control over it." As the state has not been deprived of its property by any act of the defendant, as in fact the defendant has never been in possession of this property, or in any way done anything with it, he cannot be made accountable for the loss which the state may have sustained from the proceedings of Jewett Bros., or those acting in their behalf in disposing of these logs. Judgment for defendant with costs.